285 So.2d 761 (1973)
Dr. David L. PERKINS
v.
H.W. BLACKLEDGE and Jean Blackledge.
No. 47295.
Supreme Court of Mississippi.
December 3, 1973.
Bacon & Smith, Jackson, for appellant.
Barnett, Montgomery, McClintock & Cunningham; James R. Ford, Jackson, for appellees.
ROBERTSON, Justice:
Appellant, Dr. David L. Perkins, sued Appellees, H.W. Blackledge and wife, Jean Blackledge, in the Circuit Court of the First Judicial District of Hinds County, for $6,000, the rental for two years under a five-year written lease contract; and also the cost of restoring the leased space to its former condition. Plaintiff charged that the Defendants moved out without notice to him, and thus, wrongfully terminated the written lease contract.
After a full trial, the jury returned a verdict for the Defendants Blackledge. Perkins appeals.
*762 On September 10, 1969, Perkins entered into a written lease with the Blackledges for space in an office building and small shopping center owned by him, which space would be used for a ladies beauty parlor. The lease was for a five-year term, beginning September 15, 1969, and the annual rental was $3,000 payable in advance. The Blackledges paid the first year's rental, which covered the period from September 15, 1969, to September 15, 1970.
Almost immediately after opening up, according to the testimony of the Blackledges and their witnesses, vulgar and obscene language could be heard through the partition wall between the beauty shop and the office of Dr. Perkins next door thereto. The Blackledges testified that they complained to Dr. Perkins, that he promised to remedy the situation, but that the rough language of Dr. Perkins and his friends continued to come through the wall and to be heard by the Blackledges and their customers.
Testimony offered by the Blackledges was that Perkins operated a package liquor store on the south side of the beauty salon and that drinking went on in Dr. Perkins' office on the north side of the beauty salon, and that friends or patients of Dr. Perkins would from time to time mistakenly enter the beauty salon, thinking that they were returning to Dr. Perkins' office.
The Blackledges and some of their customers testified that a physical altercation took place on the parking lot in front of the beauty shop between a friend of Dr. Perkins and another person, and that customers of the beauty salon feared for their safety.
The Blackledges also testified that the only restroom provided for their beauty parlor was used from time to time by Dr. Perkins and his friends, and that on some occasions his friends passed through a part of the beauty shop in tee shirts, and used boisterous and vulgar language on their way to the restroom.
In early December, 1969, the Blackledges finally blocked the entrance from Dr. Perkins' office with a counter or table on their side of the partition. Perkins came into the beauty salon complaining of this closing of the passageway, and Mr. Blackledge testified that Perkins told him on that occasion: "You can get you another place to go and I'll release you of your lease, because I want my bathroom." Blackledge also testified: "This was the only occasion that Dr. Perkins said he wanted his building and he would release us of our lease."
On March 9, 1970, the Blackledges purchased a vacant lot on West Capitol Street and began construction of a new beauty salon. Blackledge testified that after buying the vacant lot he had a conversation with Dr. Perkins and that:
"Dr. Perkins said that he had somebody that wanted to lease the building, to rent the building. That if we would notify him about the time we were going to be ready to move out. About a month  we moved June the 13th of 1970. About a month before we moved, I told Mr. Perkins that we'd try to move by the 15th of June or the first of August  of July. Dr. Perkins said then that he had somebody that wanted to lease or rent the building; that from the time that we moved up until September the 15th that he would give me part of the money that we had already prepaid; that that would help him and that would help me, too."
Blackledge testified that they moved the beauty shop to the new location on West Capitol Street on June 13, 1970, that Dr. Perkins witnessed the moving and wished them luck in their new location, and that he handed the keys to the leased premises to Dr. Perkins.
The testimony of Dr. Perkins and his witnesses was in direct conflict with that of the Blackledges and their witnesses. Perkins testified that there was no loud, boisterous, obscene or vulgar language in his office next to the beauty shop; that he did not tell the Blackledges that they could *763 find another building and move out; that he did not tell Mr. Blackledge that he had another tenant for the space leased to them; that he was well satisfied with his lease to them; that he did not object to their moving out on June 13, 1970, because he did not know what their plans were and that they had prepaid the rent to September 15, 1970, and he would have no right to object. Perkins testified that Blackledge did not give him the keys to the leased space, and that he, Perkins, had to have a new set of keys made. Although he had tried very hard, he had not been able to rent the space vacated by the Blackledges.
Perkins complains that the trial court erred in granting Defendants' Instruction No. 4 and in refusing to grant Plaintiff's Instruction No. 9. Plaintiff's Instruction No. 9 was, as follows:
"The Court instructs the jury for the plaintiff, Dr. David L. Perkins, that any attempt or notice by the defendants to change or terminate the lease sued on herein, would have to be in writing and signed by the parties to be charged; otherwise, such oral cancellation of the lease would be void and would violate Section 264 of the Mississippi Code of 1942, being known as the Mississippi Statute of Frauds, and if you believe from a preponderance of the evidence that the lease between Dr. Perkins and the Blackledges was not terminated by a writing signed by Dr. Perkins, then it is your sworn duty to find for the plaintiff."
We think that the trial court was correct in refusing to grant Plaintiff's Instruction No. 9. Section 264 does not require a cancellation to be in writing, and we are unwilling to so hold. We did hold in Nason v. Morrissey et al., 218 Miss. 601, 67 So.2d 506 (1953), and we think correctly so, that:
"[A] contract required by the statute of frauds to be in writing cannot be validly changed or modified as to any material condition therein by subsequent parol agreement so as to render the original written contract as modified an enforceable obligation." 218 Miss. at 610, 67 So.2d at 509.
In the case at bar, the defendants asserted by way of defense only that the plaintiff had agreed to release them from their written lease in consideration of their agreement to let him retain 3 1/2 months unearned rent. They also contended, by way of defense, that the plaintiff first breached the contract by constructively evicting them. The facts are greatly different from Nason where the attempt was to orally change or modify a written contract and then to specifically enforce the original written contract as orally modified.
We do think that the court erred in granting Defendants' Instruction No. 4, which provided:
"The Court instructs the Jury that if you believe from a preponderance of the evidence that during the term of the lease Plaintiff and the Defendants mutually agreed upon mutual considerations, each to the other, that the lease was cancelled and terminated, before the Defendants vacated the leased premises, then in that event the Defendants owed no further duty or rent to the Plaintiff, and if you believe that there was such a mutual cancellation and consideration, then in that event it is your sworn duty to return a verdict for the Defendants."
This was a general instruction using such vague and general terms as "mutually agreed upon mutual considerations" and "mutual cancellation and consideration" without any tie-in to the facts of this particular case and without any guidelines or standards to aid the jury in considering the conduct, actions and language of the parties.
Appellant next complains that the trial court erred in granting Defendants' Instructions 2 and 3 and refusing Plaintiff's *764 Instruction 11. Plaintiff's Instruction 11 provided:
"[T]hat the burden is on the defendants to prove by a preponderance of the evidence that the Plaintiff, David L. Perkins, released the defendants from the payment of rent due under the lease contract or ousted, dispossessed or evicted defendants from their occupancy or possession of the premises or materially or substantially invaded the operation, control and possession of the leased premises ..."
We think that the trial court correctly refused to grant this instruction. The language was entirely too broad. The only meaning that the jury could get from the language used in the instruction was that there must be an actual ouster, dispossession or eviction, or an actual physical invasion of the leased premises. This instruction was not complete; it omitted any reference to a constructive eviction.
Appellant complained of Instruction 2 granted the Defendants, which instruction attempted to define constructive eviction in this way:
"[T]hat there is known in the law a term `Constructive Eviction' which is defined as conduct of the landlord which deprives the tenant of the beneficial enjoyment of the leased premises although the tenant is not physically thrown out or evicted from the premises the tenant may terminate the lease and extinguish his liability for future rent, but the tenant can avail himself of the defense of constructive eviction and vacate the possession of the leased premises within a reasonable time after the wrongful act or omission to act on the part of the landlord."
52 C.J.S. Landlord and Tenant § 455 (1968) has this to say about constructive eviction:
"An intentional act or omission of the landlord, or by those acting under his authority or with his permission, that permanently deprives the tenant without his consent of the use and beneficial enjoyment of the demised premises or any substantial part thereof, in consequence of which he abandons the premises, constitutes a constructive eviction. However, not every deprivation of the beneficial enjoyment of the premises necessarily amounts to a constructive eviction, and it is necessary that the landlord, by some intentional act or omission, materially and permanently interfere with the beneficial enjoyment or use of the demised premises or a material part thereof, and that, in consequence of such act or omission, the tenant abandon the premises within a reasonable time, as discussed infra § 457.
"Furthermore, there must be an injurious interference by the landlord, depriving the tenant of the beneficial enjoyment of the premises, or materially impairing such beneficial enjoyment. In other words, the landlord's interference with the tenant's use and enjoyment must be substantial and effectual, material, fundamental, permanent, and intentional,
......
"... The act or omission complained of must be that of the landlord, and be one done by his procurement, or one for which he is responsible, and not merely that of a third person acting without his authority or permission, ..." 52 C.J.S. at pages 303-305 (Emphasis added).
A careful reading of Defendants' Instruction 2 discloses these fatal defects in the definition of constructive eviction: There was no mention of "an intentional act or omission of the landlord" and also no mention of a permanent deprivation of the use and beneficial enjoyment of the demised premises. Where constructive eviction is to take the place of actual eviction, the term must be carefully and accurately *765 defined; otherwise the jury will be hopelessly confused. In addition such an instruction must specifically tie-in with the facts of a particular case. It was no help to the jury for Instruction 2 to provide:
"And, if you believe from the evidence in this case that the landlord, Dr. David Perkins, participated in, acquiesced in or allowed conduct on the leased premises so that H.W. Blackledge and Jean Blackledge were deprived of the substantial or material beneficial use of the leased premises, and if you further believe from the evidence that such act, or acts, if any, constituted a constructive eviction of the Blackledges from the leased premises and that thereafter, and within a reasonable length of time after such conduct or acts on the part of the landlord, if any, ... ." (Emphasis added).
Such general words as "conduct or acts" actually tell the jury nothing. There were no guidelines, no standards, no limitations and no restrictions given the jury in this instruction. It was fatally defective in these particulars.
Appellant also complains of Defendants' Instruction No. 3, which provided in part:
"[T]hat if you believe from a preponderance of the evidence Dr. Perkins failed to exercise reasonable care in providing Defendants with the quiet and peaceable enjoyment of the leased premises, then in that event, the Court instructs the Jury that the Defendants had a lawful right to leave the premises and to cancel the lease, ... ."
As we see it, the general term "reasonable care" has no place in an instruction on what constitutes a breach of the covenant of quiet and peaceful enjoyment of leased premises. This was an action on a written contract, not a tort action. The only effect the use of the general term "reasonable care" would have on the jury would be to confuse and mislead them.
Because of these fatal defects in the three instructions complained of, we must reverse the judgment of the lower court and remand this case for a new trial.
Reversed and remanded.
RODGERS, P.J., and PATTERSON, SMITH and SUGG, JJ., concur.
SUGG, Justice (specially concurring).
I concur in the result reached but am unable to agree with the statement in the opinion that "Section 264 does not require a cancellation to be in writing and we are unwilling to so hold."
This statement, without qualification, in my opinion, is contrary to the holding of Bradbury v. McLendon, 119 Miss. 210, 80 So. 633 (1918) where this Court stated:
It is contended here by the appellee that, inasmuch as the lease was in writing, and necessary to be in writing to make a valid lease for five years under our statute, it would necessarily take an instrument of writing to surrender the lease, as it had longer to run than one year. If it was a mere executory agreement unperformed in any particular, this contention would be sound, but on the particular facts of this case, where not only was the instrument of writing surrendered and possession delivered up by Kennedy, and possession taken by Bradbury, but also other considerations passed between the parties, to wit, the surrender of live stock for which the firm was indebted, it presents a case where the partnership would be estopped to set up the plea of the statute of frauds or other plea of the necessity of writing to make valid the surrender of the lease. The entire plantation property was taken charge of by Bradbury under this agreement, his notes against the partnership given up, and the partnership lease ending through its agent, authorized to manage its financial business, having surrendered and delivered the instrument of *766 writing creating the lease, and Bradbury having obtained full possession under such surrender, makes the transaction a completed, executed contract... . (119 Miss. at 219, 80 So. at 635) (Emphasis supplied).
Bradbury holds that a cancellation of a lease contract required to be in writing under the statute of frauds must be in writing unless the cancellation falls within the exception recognized therein.